In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 15-2543

IN RE: GT AUTOMATION GROUP, INC.,

*Debtor.*

_____

ARLINGTON CAPITAL, LLC,

*Objector-Appellant,*

*v.*

BAINTON MCCARTHY LLC and
SMITH, GAMBRELL & RUSSELL, LLP,

*Applicants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:14-CV-98 — **Theresa L. Springmann**, *Judge.*

_____

ARGUED JANUARY 6, 2016 — DECIDED JULY 8, 2016

_____

Before POSNER and WILLIAMS, *Circuit Judges*, and
PALLMEYER, *District Judge*.[*]

WILLIAMS, *Circuit Judge*. The appellees in this case, who
we refer to as the "Law Firms," performed legal services for
a bankrupt estate and asked the bankruptcy court to ap-
prove their fees. The appellant, Arlington Capital, LLC, is a
general unsecured creditor of the estate. Arlington objected
to the fee petitions, arguing that the Law Firms should not
be paid because their work never had a chance of benefiting
the estate. The bankruptcy court approved the petitions and
the district court affirmed. Arlington wants us to reverse but
it has not shown that it stands to benefit if the Law Firms'
fees are denied. So we remand and instruct the district court
to dismiss the case for lack of standing.

## I. BACKGROUND

GT Automation Group, Inc., owed its bank, Comerica,
Inc., about $7.8 million, and that loan was secured by a lien
on all of GT's assets. GT filed for bankruptcy and its assets
were auctioned off. Bids were submitted, including a "credit
bid" from Comerica (meaning Comerica offered to take GT's
assets in exchange for forgiving the $7.8 million debt). Also,
Comerica agreed that its lien would be extinguished by the
sale. So if the assets sold for more than $7.8 million, Comeri-
ca would get $7.8 million and the excess would go to the es-
tate. If the assets sold for less than $7.8 million, all of the
purchase money would go to Comerica, and Comerica
would have an *unsecured* claim for the difference. Either way,
the successful bidder would take the assets free and clear of

---

[*] Of the Northern District of Illinois, sitting by designation.

Comerica's lien. Arlington—the appellant here—was the successful bidder, with a bid of about $2.7 million.

Later, the bankruptcy trustee came to believe that Arlington had colluded with some GT insiders to keep the auction price down. If that were so, 11 U.S.C. § 363(n) would allow the trustee to undo the sale or recover from the colluders the difference between the true value of the assets and the depressed sale price. The trustee hired the Law Firms—the appellees here—to pursue the § 363(n) claim against Arlington and the GT insiders. In that lawsuit, the trustee contended that GT's assets had truly been worth $5 million ($2.3 million more than Arlington paid). The GT insiders settled the case but Arlington went to trial, and won. Because it was awarded its litigation costs, Arlington became a general unsecured creditor of GT's estate, for about $5,000.

After the § 363(n) claim was resolved, the Law Firms asked the bankruptcy court to approve their fees. Arlington objected, contending that the Law Firms' services had not been reasonably likely to benefit the estate. (Bankruptcy courts cannot approve fee petitions in such situations. 11 U.S.C. § 330(a)(4)(A)(ii)(I).) Arlington argued that even if the § 363(n) suit had been successful, GT's estate would not have benefited because any recovery would have gone to Comerica. Arlington's argument was based on its reading of the Bankruptcy Code, and also on its observation that the trustee did not even *allege* that GT's assets had been worth more than $7.8 million (the amount of Comerica's original lien). So even if there had been collusion, only Comerica was harmed, not the estate.

The Law Firms disagreed. Under their reading of the Bankruptcy Code, because Comerica had agreed that its lien

was extinguished by the auction, any recovery from a
§ 363(n) suit would have belonged to GT's estate, not Comerica. The bankruptcy court agreed with the Law Firms and
approved the fee petitions. The district court affirmed and
Arlington now appeals.

## II. ANALYSIS

Before we can reach the merits, we must ensure that we
have jurisdiction. We lack jurisdiction if Arlington lacks "Article III standing." *United States v. Windsor*, 133 S. Ct. 2675,
2685 (2013). A plaintiff has Article III standing if, and *only* if,
it has suffered an "injury in fact," which is "fairly traceable"
to the challenged action of the defendant, and which would
"likely" be redressed by a favorable decision. *Id*. at 2685–86
(internal brackets omitted) (quoting *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 559–62 (1992)). Standing is lacking if it
is merely "speculative"—as opposed to "likely"—that the
plaintiff's injury would be redressed by a favorable decision.
*Id*. In the bankruptcy context we have said that an appellant
lacks standing if it is "unable to realize any economic benefit
from a potential reversal." *In re Stinnett*, 465 F.3d 309, 315
(7th Cir. 2006). We have noted that debtors often lack standing to challenge bankruptcy orders "because no matter how
the estate's assets are disbursed by the trustee, no assets will
revert to the debtor." *In re Cult Awareness Network, Inc.*, 151
F.3d 605, 607 (7th Cir. 1998).[1]

---

[1] We have written that "bankruptcy standing" is "a form of prudential standing," *In re Ray*, 597 F.3d 871, 875 (7th Cir. 2010), that is "narrower than Article III standing," *Cult Awareness*, 151 F.3d at 607. The Supreme Court has since clarified the meaning of "prudential standing"
and reaffirmed that "a federal court's obligation to hear and decide cases
within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static*

Arlington, as the party "invoking federal jurisdiction," bore the burden of demonstrating standing. *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (quoting *Lujan*, 504 U.S. at 561). It utterly failed to carry that burden. Arlington made no mention of standing in its opening brief. In their brief, the Law Firms made a substantial argument that Arlington lacks standing. Specifically, the Law Firms noted that: (i) the estate's only asset is cash of about $225,000; (ii) under Arlington's own theory, most of that money is owed to Comerica, leaving only about $105,000; (iii) as Arlington acknowledged in the bankruptcy court, $300,000 of administrative claims have already been filed, which would take priority over Arlington's general unsecured claim; and (iv) additional administrative claims, which would also take priority over Arlington's claim, are still likely to be filed. So, the Law Firms argued, it is "difficult to imagine any scenario where Arlington would ever be entitled to a distribution on its general unsecured claim." In its reply brief, Arlington countered the Law Firms' argument with … nothing.

An argument not responded to is ordinarily deemed waived. *Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005). Nevertheless, we gave Arlington's lawyer an opportunity to orally argue that Arlington has Article III standing, but no such argument was made. Asked whether Arlington would get "even a dollar" from a favorable decision, he responded, "Who knows?" He urged that it was "theoretically possible"

*Control Components, Inc.*, 134 S. Ct. 1377, 1386–88 (2014) (internal quotation marks omitted). This case concerns Article III standing only, so we do not discuss whether, after *Lexmark*, the standing analysis in bankruptcy cases involves any "prudential" considerations.

that Arlington would benefit, but he could not describe his theory. Indeed, he confirmed that he had "no idea" how many claims had been filed against GT's estate that would take priority over Arlington's claim, nor did he know the aggregate dollar value of such claims, nor the likelihood that any such claim would be approved by the bankruptcy court. Without a doubt, Arlington has failed to demonstrate that it has Article III standing. *Cf. Cult Awareness*, 151 F.3d at 608 (debtor, whose standing required a reasonable possibility that assets would remain after all creditors were paid, did not carry its burden by speculating that it would receive large awards from victories in other pending lawsuits).

Oral argument revealed that Arlington's true goal has nothing to do with its general unsecured claim for $5,000. Arlington hopes to file a separate lawsuit against the Law Firms for their role in bringing the § 363(n) suit, and thinks it would be useful to have an opinion from us saying that the § 363(n) suit was pointless. Whatever the merits of its contemplated suit, Arlington is not entitled to—and indeed we lack the authority to offer—an advisory opinion to be used as a sword in independent litigation.

### III. CONCLUSION

The judgment is VACATED and the case is REMANDED to the district court with instructions to dismiss for want of jurisdiction.